Thank you, Your Honor. Good morning, if it pleases the court. My name is Lawrence Murray. I'm here on behalf of Mr. Tarver, who is the appellant, and the plaintiff below. We're here because summary judgment was granted against all of his claims and denied as to his motion for summary judgment. Before I get into the minutia of a lot of this, I wanted to step back for a second and offer an observation. That police officers in California quite often fear that FEHA and Title VII ADA really don't apply to them. That there is a fear that if they make a claim, they may not ever get back into the police department. And a case like this is something that is watched very closely. I point that out because Mr. Tarver had 18 years of excellent service. He had a lot of murder arrests, et cetera, et cetera. He was a very good officer, not disputed. He was a very good police officer, not disputed. He got hurt arresting a drunk driver, not disputed. When it comes down to it, though, he went – he couldn't get healthy in the department, so he went out for a total of eight months and tried to come back. And as the city and county assistant chief of police testified, hey, we don't take anybody back who asks for an accommodation. Tarver asked that if he had to stand at a post for 10 hours, that he at least be able to stretch a little because it would hurt his back to not be able to stretch. That was the sole accommodation he asked for. They refused. We went – we lost summary judgment in the trial court. We went up on a court of appeal. It was reversed. We came back, and he got a judgment. He had numerous protected acts in the process of going from asking for the accommodation all the way through a judgment. The judgment wasn't even final when he tried to get back in. His trial, I believe, of memory surgery was January, February of 2006. In 2007, he tried to get back in. In fact, he started in 06, right after the judgment. Now, there is no question that for the past eight or nine, six years, he was working as a park ranger doing heavier work than that of a police officer. So he can do the job. So he comes back, and he wants to laterally transfer. The lateral transfer officer is Gafford. Gafford testifies, I didn't know he was – he was a – sued us. Interesting, though, that his boss and others who had worked with him testified in that case, and more importantly, the assistant – now assistant chief, then the lieutenant, Denise Schmidt, said, I talked to him. I saw the application that Gafford said he never had. I saw it in his hand. Well, lateral transfer means, in common parlance at least, transferring laterally from one position to another. It doesn't mean reentering the workforce. So I guess I'm not quite sure I understand the argument here. Okay. There's two ways to become a police officer in San Francisco. One is you're working somewhere else as an 830 PC. That is, 830 of the Penal Code defines police officers. You're working, say, in Oakland. You're working in Emeryville. You're working somewhere else. Because you've got two years out of the last ten, the post, police officers' standards and training, says they can bring you right in and give you a shortened time frame. Instead of going through the four or five months of training, et cetera, come in, you do one month, you're out on the street, you're good. We – the post will recognize that as a valid means of bringing someone in. The other means is you apply from the start and you go through the application process and you go all the way to the end. And when you get to the end, you still have to go and take all the tests and you go out on the police car and you're a field training officer with you for 16 weeks, the first one, then the second one, then the third, all of that. So it's a much easier process. Well, so are you saying if you are working in another position and you apply for lateral transfer, you don't have to meet the physical requirements? No. What I'm saying is that there's two ways of going in, and either one, under either one, Tarver passed the physical requirements. The question is, would he – should he have been considered as a lateral transfer and if they refused to consider him, were they telling the truth? And is that an adverse employment action, failure to hire? The second is – What, was he working in another police department? He was working as a peace officer in another department, right. That department downsized. The Solano Regional Park System got rid of its police officers because they couldn't afford it. He was without a job. Prior to being without a job, he was ready, willing and able to come back to San Francisco because they make close to two and a half to three times more for the same eight-hour shift. So he's, you know, he's been there. He's done 18 years as a San Francisco cop. He wants to come home. Where did the district court go wrong in this issue, then? First of all, they didn't consider any of the evidence. They don't talk about the evidence that's favorable to him. And they misquote, for example, the first one, Gafford. They misquote Gafford and they misquote the rules as it relates to Gafford. Gafford later admitted in his deposition that I took that if the officer has two out of ten years in police work, he's eligible under post to come over. But it – but he originally refused to acknowledge that. Well, the district court said he wasn't eligible for a transfer, when, in fact, the truth is, under police officer standardized training, which is the law in California that they have to follow, he was eligible for transfer. Second, there's a number of assertions of fact that the district court completely ignores or gets wrong in its rendition of an order for summary, granting summary judgment against us. For example, the district court said, well, he failed this PHQ test and, therefore, he's out. But that's not what Post says and that's not what the law says. I want to take one. There's four or five, but I want to take one that's most telling. He got 9 points out of 13 against him for bankruptcy. That in and of itself does almost all the damage. If he didn't have to file bankruptcy, he would have never been denied a position as a police officer. Let me finish this point, if I might, Your Honor. Under Post, it says you can consider bankruptcy and financial irresponsibility, but you must consider whether or not it is the result of something other than financial irresponsibility, such as discrimination. It says that we put that particular piece right in our opposition. Discrimination is exactly why this man was unable to meet his debts and had to go bankrupt. And discrimination is the reason. But how does this add up to your Federal claim is discrimination on account of disability? Discrimination. Well, first of all, retaliation. Retaliation. Retaliation for having to. And the retaliation is because of the prior suit. How does this indicate either one of those? Let me get the first question. I believe you asked, how is this discrimination? From the very start, because he had back surgery, because he was unable to work the streets, because he asked for an accommodation, his department in the case, the prior trial, which we've submitted all the material in as of 06, when he applied to come back, considered him to be disabled. They considered his back to be a disabling injury that they don't want him back because of. And that's what the department doctor testified to. So you've got the department considering him physically damaged, and they don't want him back because of that. And that occurs, that's the testimony that occurs in 2006 in February. Two months later, he's applying to return to work as a lateral. So that's the first part. You had, there was two parts to your question, Your Honor, and I forgot the second one. The retaliation. How does all of this tend to show retaliation? In 2006, he's the first and only one in over 10 years to get a judgment against the San Francisco Police Department for any type of discrimination. Two months later, he says, I want to come back. The trial court said, well, there's really no tie-in together. But all of your decisions in the Ninth Circuit and throughout the United States have said time in and of itself could be enough. And more importantly, when Gaffett says he didn't know that Tarver was trying to get, that Tarver had sued them and that had never received his application for a lateral, his captain standing right there, who I took her deposition and her testimonies before you, and Denise Schmitt says, I saw the application in his hand. What do you mean he didn't do it? Second. Let's say we believe, let's say that we believe the evidence in your favor on that. Does that get you, how far does that get you? He said Gaffett was lying about whether he got this guy's phone calls, got the application. I believe under Reeves versus Sanderson-Plumbing, it causes more than just a question as to whether or not the police are telling the truth on this. And it gets us an opportunity for trial. We're not saying we want to necessarily win judgment today, but we want to get a trial on the merits. And there's totally be enough. If we said Gaffett was lying or there was a reasonable probability that a jury could find that he was lying, would that get you past summary judgment? I don't think so. I think we would need more, and I think we have the more. The more is that he had applied for being, returning as a police officer months after winning his judgment. There's a temporal proximity in time that he did this. He is the only one that has done this in over 10 years, successfully sued the police department. There is questions. There's the same unit that Gaffett is part of is the unit that was involved in this lawsuit that had just ended. More importantly, if I can get the two of these together, we're talking about Gaffett now, Sergeant Jimenez. Sergeant Jimenez, when I took her deposition, which is in the record, says that when she was called upon to do his background, the sergeant handing it to him, Callahan, says one thing. He sued us and won. He sued us for discrimination and won. Why is that at all important when it comes time to think about whether or not this man is qualified to work as a San Francisco police officer? In fact, when he had just finished 18 years of doing a great job, which he got a lot of commendations for, it isn't. It sets the mode, it sets the reason, it sets the way she went about this. If I can point out one thing here, Your Honor, every time you look at the postmanual, which is in the record, the postmanual says you don't go ahead and cancel somebody out just because they have a bad answer. You've got to look into the answer and see if there is extenuating circumstances, if they got it wrong, et cetera. In the police work, if you fail to say something that you – that they might consider important, you get caught for lying. So if you're – pardon the expression, you're kind of damned if you do and you're damned if you don't. On the one hand, if you don't put everything in there and put it in the darkest light, you're going to lose, and if you do, they're going to necessarily just look at that and not go beyond it. That's why Post says you have to look beyond it. You have a duty to go into it. The bankruptcy example I gave earlier, in that bankruptcy example, it says you have to look at why the bankruptcy occurred. Was it by physical irresponsibility or was it discrimination? Here, it's documented. We have a judgment saying it was discriminated. He was discriminated against, and that's why he could not, because he didn't have income for four years. That's where we got a $400,000 judgment. Right. For income. Okay. I think we understand that. You may want to reserve some of your time for this battle. I do not. Thank you. Thank you. May it please the Court. Lisa Berkowitz for the City and County of San Francisco. My intent was to try to address some of counsel's arguments. I'll try to do that, but I'll also cover sort of what I believe are the main points. First, to correct a couple of things, I think he was referring to Sergeant Juarez, Martha Juarez, not Jimenez. And the year that Tarver attempted to come back as a lateral was in 2007, not in 2006. The state court trial ended in the jury verdict, I think, April 1st or so, March 1st in 2006. And he reapplied. He attempted to reapply about 14 months later, and that goes to my temporal proximity argument and my retaliation argument in my brief. But essentially plaintiff brings retaliation claims under state and federal law and physical disability discrimination claims under state and federal law, failure to prevent discrimination and a failure to engage in an interactive process claim. I agree completely with Judge Ilston's decision, of course, and getting back to what one of you mentioned earlier, I don't think she was incorrect. Mr. Murray claimed that she was incorrect and that she presumably balanced credibility or weighed evidence in some way. And I don't think she did that. I think that you cannot overcome evidence by speculation. That's the Thornhill case. And what we have in plaintiff's briefs and plaintiff's argument is a lot of speculation. We have statements by counsel and by his client that, for example, Officer Gaffood was lying or that Officer Gaffood was making up requirements for lateral police officers, and somehow this established some sort of underlying animus against the plaintiff. It's slightly different from the argument in their brief, actually. The Reeves case, which is one of the cat's paw cases, in plaintiff's brief he sorts of puts that analysis on its head and argues that because the prior chief of police, Chief Fong, allegedly had some animus toward plaintiff that it was directly imputed down the chain to Gaffood in some way, and of course that's not what the cat's paw analysis holds. It holds that you have to have some sort of evidence, some sort of circumstantial evidence, direct evidence of animus on the part of the lower level manager that had some decision-making authority for the adverse employment action made, and then that decision-making authority or animus, rather, is imputed up the chain of command here to perhaps, if you had other evidence as well, overcome summary judgment. But we don't have that here. We have Officer Gaffood telling Tarver, when he came to see him, that there are one of the main requirements to be a to come into the department as a lateral officer is that you have to be currently employed as a current officer. That was indeed the rule. Yes, and if you look, you know, and I looked at plaintiff's evidence as to what he put forward to you as to why that was not the rule, and in fact it was just a cite to Tarver's own declaration, which is not a part of the excerpts of record. It's not even properly before this Court under the local rules, but it attached a copy of the computer printout from our website that actually says you have to be a current peace officer. There's no dispute that you have to be a current peace officer when you come to apply. Tarver was told that by Officer Gaffood, and he was also told that by, I forget her rank at the time, by Trina Waring in a January of 2008 letter when he was then beginning the process to come back as an entry-level officer. Tarver tries to create a dispute of fact by just blankly saying, no, that's not the case. But you can't create a dispute of fact by just saying, no, that's not the case, without any evidence. So that was indeed the case. He was told that when he came down in what Officer Gaffood recalls was August or September of 2007. And then, of course, three or four months later, he makes an inquiry again to the department wanting to come back. Trina Waring in January of 2008 sends him a letter saying, you need to be a lateral officer. You're not, so you can begin the process for an entry-level position. So one of the issues in this case is, you know, where is the adverse employment action here? Is it us not responding to an email or a letter or something for a lateral position? Is it the rejection, his failing the background exam, which I believe is set forth pretty thoroughly in the papers. It's an equally applied test. He scored 16 problem points, and just like everybody else who scores 16 problem points, the bankruptcy, the domestic violence, the other issues that he had, he failed. And even then we don't flunk them out, and even then Tarver was not flunked out. He had the opportunity to go forward in the process, which he did. He went through another physical agility exam, and his name was on a list. And that's when he had the conversations with Sergeant Juarez, which I'm interpreting yet another, him to bring as yet another adverse employment action that Sergeant Juarez didn't call him back to pursue his entry-level application or something, I'm not exactly clear what his adverse employment actions are. But I address that anyway in my brief, that the facts on that issue is that Sergeant Juarez told him you've got to lose the weight, he was over the weight limit, and call me back and we'll discuss these problem points that you have on your background exam. And then I have the discretion as a sergeant in the police department whether to move you forward in the process or not. He never called her back, he had in fact filed his federal lawsuit three days before he had that phone, three days before he even talked with Sergeant Juarez on June 12th of 2008, he had filed his lawsuit on June 9th of 2008. And again, when we talk about any sort of retaliatory animus or motive on behalf of Sergeant Juarez, there's no evidence she was ever involved, and in fact she wasn't. I've been litigating this case for nine years, and she wasn't involved in the first lawsuit, and there's no evidence in the record she was, and in fact she didn't know who Tarver was when he came in the door and when his application came to her desk. Regarding, there was also a misquote of then Lieutenant Denise Schmidt, as noted in the district court's order, Denise Schmidt, the only, Denise Schmidt had no evidence or input in making Tarver's application go one way or the other. The district court quotes a part of the record, a part of her deposition transcript in which she actually states, treat his application like everybody else's. And that's exactly how Mr. Tarver's application was treated here. He did not have the requirements to become a lateral, and when he did have the requirements to become an entry level, he was processed the same way as everybody else was processed. He decided not to pursue it and pursue yet another lawsuit. It's likely, you know, it's hard to predict, he may have failed, he had too many problem points, but we don't know, because he never picked up the phone and called Sergeant Juarez back. I'll just spend a minute or two on the physical disability discrimination claims. Some of what Mr. Murray was talking about is actually res judicata, it was from the last case, it's not relevant. When Mr. Tarver, what is relevant is Mr. Tarver's, any physical disability that he may have had or that the city regarded him as having when he started to attempt to reapply to the department in 2007. And I think the district court was right on in this, there's no evidence of physical disability or that the city regarded him as physically disabled when he attempted to come back to the department in or around May of 2007. In fact, if you look in the record, in Tarver's complaint and declarations he submitted, he asserts over and over again that he has no physical disability and that he does not need an accommodation. And the city did not dispute that. In fact, according to the city's own evidence and records, he passed the physical agility test. There was no problem with his entry-level application in regards to physical disability. He seemed physically able to do the job. Was he ever told that he had a disability that prevented him from doing the job? Not at all. Not in this case. In the last case, there was the issue, but, yeah. Right. Before, yeah. Yeah. And did he ever ask for an accommodation because of an inability to do all of the movements? No, he never asked for an accommodation. And he admits in his deposition, and that's part of the record, that he never asked for an accommodation. So that's pretty much the end of the analysis on the accommodation claim. I had also argued in the district court below that he had failed to exhaust his administrative remedies on that claim by not including it in the DFEH claim. The court broadly interpreted the claim to include it and went on to address the merits of the case. And so that's what I'm doing here. I think even if you look at the merits of the case, he never requested an accommodation. According to him, he was fit to do the job. We never regarded him as disabled for purposes of this case. And then, of course, the last remaining claim would be the failure to prevent discrimination claim, which fails under the relevant California appellate court case that says if you have no underlying discrimination, there can't be a failure to discriminate claim. Well, I'm short some time, but I think I'm done unless the Court has any further questions. There don't appear to be any. Thank you. Thank you. If I might. First, Sergeant Juarez says that she told him to call him back. He says, I never got a call. I never was told that. I was told I was done. Second, Sergeant Juarez bounces him out on weight. She has no basis for doing that. You have before you the doctor of the San Francisco Police Department that says, hey, if somebody comes in overweight, that's just one of the criteria. We have to look at a second criteria that's body fat and body mass. There's a third criteria. Right. But it says for a man who's 5'8 tall, the maximum weight was 183. Right. That's body mass. And his weight. Was 200. According to his driver's license from 10 years before, not current, he was never asked and he never told him what the current was.  I haven't been on a scale in years. So what was the harm in them saying, okay, come over here and step on the scale? They didn't look because they didn't want to see. Next, if I might. I don't understand that weight argument. I mean, if he says this is a guess, are they supposed to say, oh, maybe actually you're way less? I mean, it seems like a lot less. I don't think they're supposed to be talking about it at all. According to the doctor, the department doctor, the weight issue comes in after they've made a qualified offer of employment, not before. They don't discuss it at that point in time, nor do they discuss psychological issues, et cetera. All of that is a process under the ADA that first you find whether or not the person has the essential qualifications to do, which they don't dispute. But then you go into things like weight, et cetera, and people who are qualified like the department doctor does it, not a sergeant who's trained to arrest people but not has no medical experience. That's why that's another red herring. I talked about bankruptcy. The bankruptcy issue is simple. You can't fail somebody out for bankruptcy, but it's something to look at because of whether or not they're fiscally aware. No, but there were a lot of points on that. I mean, there are a lot of issues. And the city's position is, well, if you'd stayed with the process further, you could have explained it, but these are problem areas. And it wasn't just the bankruptcy. It was NSF checks, 20 of them. We had fired once. He's got a punch to slap to spouse. He's got not one bankruptcy but two. And one says bill consolidation, which was explanatory, taking money from a company he's worked. I mean, that's a lot of stuff to talk about. Right. But, Judge ---- I mean, those are legitimate concerns. You'd have to agree with that. Not a problem. Not a problem. But if he's given the same opportunity as everyone else to sit and explain it, there wouldn't be an issue. For example, Dwayne was the ---- Lieutenant Dwayne was put on the witness stand by me in his trial. He says back in the day that we have a process. If you don't have enough money for gas and we're about 40 miles from the nearest bank way out here where he's working at this ---- you put an IOU in and you take the money and you put it back. That's what he was saying. The question was not theft from an employer. It said did you take any money from the employer. His answer was yeah. I did on a regular basis because there's no ATMs. I'm out here. I've got to get gas to go home. It's 2 o'clock in the morning. This is where I patrol. So that was one that was ---- remember I said earlier there's either overstatement or understatement. You have to make sure you don't understate because they look at that as ---- I understand that completely. Okay. But, you know, in the ---- Now here's the next thing. He was resigned as opposed to being fired. Yes, that's true. But he did it because he was told by his boss either he engages in sexual activity he's going to be fired. He didn't stick around. Nobody ever asked him what he meant by that. He just checked the box. If we look, if we ---- if an employer comes in and doesn't want to see something, they won't see it. If they come in with an open mind like they do for everybody else except Ted Tarver or people who've sued the Department, they will see that there is a rationale behind each of these does not ---- which does not show a candidate with a problem about his character. His character that he walked into that application process is the same character that he had for 18 years, which is the same character that he got three departmental chief's commendations, board's commendations, et cetera. Okay. Your time has more than expired. Thank you. Thank you. The case just argued is submitted for decision.
judges: Adelman, Schroeder, Thomas